**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**


LINDA J. ROEBUCK                              :

          Plaintiff,              :
                                   Case No. 3:08CV0217

 vs.                                        :

                                   District Judge Thomas M. Rose

MICHAEL J. ASTRUE,                           :    Magistrate Judge Sharon L. Ovington
      Commissioner of the Social
      Security Administration,              :

          Defendant.               :


# REPORT AND RECOMMENDATIONS[1]


## I.     INTRODUCTION

Plaintiff Linda J. Roebuck sought financial assistance from the Social

Security Administration by applying for Disability Insurance Benefits ["DIB"] on

March 6, 2002, alleging disability since March 27, 2001.  (Tr. 86-88).  She originally

claimed to be disabled by heart disease and shoulder pain (Tr. 103), but later

testified to being afflicted by depression as well.  (*See* Tr. 38, 42-43).

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and
Recommendations.

After various administrative and judicial proceedings, this Court remanded Plaintiff's DIB application to the Social Security Administration for additional consideration and analysis. (Tr. 489-505). Administrative Law Judge ["ALJ"] Daniel R. Shell conducted another administrative hearing on August 1, 2007, and again found Plaintiff not under a disability and not entitled to benefits. (Tr. 466-84). This eventually became the final determination of the Commissioner of the Social Security Administration. Such final determinations are subject to judicial review, *see* 42 U.S.C. § 405(g), which Plaintiff now is due.

This case is before the Court upon Plaintiff's Statement of Specific Errors (Doc. #12), the Commissioner's Memorandum in Opposition (Doc. #15), the administrative record, and the record as a whole.

Plaintiff seeks an order reversing the ALJ's decision and granting Plaintiff benefits, or, at a minimum, a remand of this case to the Social Security Administration to correct certain alleged errors. The Commissioner seeks an Order affirming the ALJ's decision.

## II.     BACKGROUND

Plaintiff was 56 years old at the time of the administrative decision, and thus was considered to be a "person of advanced age" for purposes of resolving her DIB claim. *See* 20 C.F.R. § 404.1563 (e). (*See also* Tr. 469). She has a high

school education. *See* 20 C.F.R. § 404.1564(b)(4). (*See also* Tr. 109). Plaintiff has worked as a typist and a shipping clerk. (Tr. 104, 469).

During the hearing on August 1, 2007, Plaintiff testified that she suffers from depression and that her depression has gotten worse due to stress. (Tr. 765). Her symptoms of depression included anxiety with paranoid ideation, crying spells and trouble sleeping. (Tr. 766-67). Plaintiff did not believe that she could work full-time due to problems with concentration. (Tr. 768).

Vanessa Harris, a vocational expert ["VE"], also testified at the hearing before the ALJ. The ALJ asked Ms. Harris to consider a hypothetical individual of Plaintiff's age, education and prior relevant work experience who had the functional capacity for light work with no overhead lifting with her right upper extremity; no forceful gripping; no use of the right upper extremity for other than gross assistive movements; no exposure to environmental pollutants or temperature extremes (less than 20 degrees or more than 75 degrees Fahrenheit); only low-stress duties involving no strict production standards or quotas; simple or even detailed work but not complex tasks; no duties that involve close teamwork to complete job tasks; and no frequent contact with the general public, although occasional contact would be okay. Ms. Harris testified that the hypothetical individual could perform Plaintiff's past work as a typist and

shipping order clerk. (*Id.*). Ms. Harris also testified that her testimony was consistent with the information contained in the *Dictionary of Occupational Titles* ["DOT"]. (Tr. 783).

Turning to the remaining information in the administrative record, the most significant evidence for purposes of the present case consists of Plaintiff's medical records and the opinions of several medical sources.

Plaintiff initially was seen for a mental health assessment at DayMont Behavioral Health Care ["DayMont"] on December 27, 2002. (Tr. 315-17). Plaintiff reported anxiety, feelings of isolation and visual hallucinations beginning in March 2001. (Tr. 315). The therapist diagnosed Plaintiff with an adjustment disorder with mixed anxiety and depressed mood and assigned a Global Assessment of Functioning ["GAF'] of 48. (Tr. 316). Psychotherapy and an evaluation by a psychiatrist to address any potential medication management were recommended. (*Id.*).

Plaintiff was evaluated by DayMont psychiatrist Chowdary Jampala, M.D., on February 12, 2003. (Tr. 310-12). On mental status examination, Plaintiff's affect was constricted, relatively stable and of mildly increased intensity. Her mood was depressed, appropriate and related. Her motor activity was decreased and she spoke in a low tone of voice. Dr. Jampala diagnosed a Major Depressive

Disorder, single episode, and assigned a GAF of 55. Dr. Jampala recommended Zoloft and continued therapy. (Tr. 312).

On April 9, 2003, a state agency reviewing psychologist, John S. Waddell, Ph.D., opined that Plaintiff had mild limitations in performing her daily living activities and in social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation. (Tr. 321-37). As to her functional capacity, Dr. Waddell opined that Plaintiff would have the cognitive capacity to complete a variety of tasks and would have the social interaction skills to interact appropriately with others in a work setting. (Tr. 325). Dr. Waddell also opined that Plaintiff had reduced concentration and persistence but still retained the capacity to complete tasks that did not require a rapid or consistent pace. (*Id.*).

In June 2003, Sehba N. Siddiqi, M.D., became Plaintiff's treating psychiatrist responsible for monitoring her medications. (Tr. 402). From July 2003 to March 2004, Dr. Siddiqi noted that Plaintiff was goal directed, had appropriate thought content, a depressed mood and flat affect, was alert and cooperative, and that her behavior was appropriate and subdued. (*Id.*). Dr. Siddiqi also reported that Plaintiff was tearful at times. (Tr. 370-81). After Plaintiff had been off her medication for about four weeks, Dr. Siddiqi noted that

Plaintiff exhibited psychomotor retardation, poverty of speech and thought, a flat affect and a depressed mood. (*Id.*). During this same time period, Plaintiff continued to be treated by a mental health counselor at DayMont. (Tr. 390-402).

On April 5, 2004, Dr. Siddiqi diagnosed Plaintiff with major depressive disorder, and assigned Plaintiff a GAF of 50. (Tr. 403-05). Dr. Siddiqi also opined that Plaintiff had moderate restrictions of activities of daily living, marked difficulties in maintaining social functioning, frequent deficiencies in concentration, and continual episodes of deterioration or decompensation under stress in work-like settings. (*Id.*). Dr. Siddiqi opined further that Plaintiff had moderate to marked impairments in making occupational, performance and personal/social adjustments, and that her prognosis was guarded since her depression was related to her physical limitations secondary to physical illness. (*Id.*).

At the request of the State agency, Plaintiff was evaluated by neuropsychologist Jerry E. Flexman, Ph.D., on January 2, 2007. (Tr. 729-33). Plaintiff reported daily activities of preparing food and cleaning her home, going to the store two to three times a month, going to the library and to her grandchildren's activities, babysitting for her grandchildren, and attending church. (Tr. 731). She watched television and visited and talked with her friends,

siblings, children and grandchildren. (*Id.*). Upon mental status examination, Dr.

Flexman observed Plaintiff to have a good energy level and pleasant tone with no

overt pain behavior. (*Id.*). She reported her mood to be "OK" and Dr. Flexman

found her to be fully oriented. (*Id.)*. Dr. Flexman found Plaintiff's attention span

and abstract reasoning to be good and her intellectual functioning to be average.

(*Id.*). Dr. Flexman reported Plaintiff's memory and judgment to be fair and her

thought processes to be normal. (Tr. 732). Dr. Flexman noted that Plaintiff's

response style during the assessment was suboptimal and her effort during the

mental status exam was poor, which he judged caused the reliability of the

results to be poor. (*Id.*).

Dr. Flexman opined that Plaintiff engaged in "moderate malingering"

during the assessment. (*Id.*). He diagnosed dysthymia and assigned a GAF of 60.

Dr. Flexman opined that Plaintiff would have slight limitations in handling short,

simple instructions, making judgments for simple work-related decisions,

maintaining attention and concentration, and interacting with supervisors. (Tr.

733). Dr. Flexman further opined that Plaintiff would have moderate limitations

in interacting appropriately with the public and co-workers and responding

appropriately to work pressures and changes in a normal work setting. (*Id.*).

During the ALJ's August 2007 hearing, an impartial psychologist, Mary Eileen Buban, Psy.D., after reviewing the medical record and hearing Plaintiff's testimony, testified that Plaintiff's mental condition did not meet or equal the requirements set forth in the Commissioner's Listings. (Tr. 768-82). Dr. Buban reported that since cognitive difficulty was not indicated, simple and detailed work were appropriate. (Tr. 780). According to Dr. Buban, Plaintiff would be limited to low stress work with just occasional contact with the public. Dr. Buban eliminated Plaintiff from close-knit work teams necessary to finish tasks and from strict production quotas. (Tr. 780-81). When asked whether she disagreed with the treating psychiatrist's opinion, Dr. Buban responded:

> No. I think her evaluation is different than my evaluation. My evaluation is based solely on the psychological/psychiatric symptoms and looking at the treatment record as it exists. As I indicated, when I reviewed Dr. [Siddiqi's] evaluation, she was considering the physical in addition to the psychological/psychiatric, so I believe that's where there might be a difference in evaluating still.

(Tr. 782).

## III.  THE "DISABILITY" REQUIREMENT & ADMINISTRATIVE REVIEW

### A.  <u>Applicable Standards</u>

The term "disability" as defined by the Social Security Act carries a

specialized meaning of limited scope. Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are "medically determinable" and severe enough to prevent the claimant (1) from performing his or her past job, and (2) from engaging in "substantial gainful activity" that is available in the regional or national economies.[2] *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. (*See* Tr. 467-68). *See also* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any Step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

---

[2]Impairments also must be either expected to cause death or last 12 months or longer. *See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70.

5.      Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

### B.    The ALJ's Decision

At Step 1 of the sequential evaluation, the ALJ found that Plaintiff met the insured-status requirement for DIB eligibility through December 2006. (Tr. 483). The ALJ also found at Step 1 that Plaintiff has not engaged in substantial gainful activity since her claimed disability onset date of March 27, 2001. (*Id.*).

The ALJ found at Step 2 that Plaintiff has the severe impairments of residuals of coronary artery disease, right shoulder abnormality, symptoms of bilateral carpal tunnel syndrome, and affective (depressive) disorder. (*Id.*). The ALJ determined at Step 3 that Plaintiff does not have an impairment or combination of impairments that meet or equal the level of severity described in Appendix 1, Subpart P, Regulations No. 4. (*Id.*).

At Step 4 the ALJ found Plaintiff capable of performing the exertional requirements of light work as such work is defined for Social Security purposes, subject to the following additional limitations: no overhead lifting with her right upper extremity; no forceful gripping; no use of the right upper extremity for

10

other than gross assistive movements; no exposure to environmental pollutants

or-temperature extremes (less than 20 degrees or more than 75 degrees

Fahrenheit); only low-stress duties involving no strict production standards or

quotas; capable of simple or even detailed work but not complex tasks; not

required to perform duties that involve close teamwork to complete job tasks; no

frequent contact with the general public, but occasional contact is not precluded.

(Tr. 484). The ALJ further found that Plaintiff was able to perform her past

relevant work as a shipping clerk or typist. (*Id.*). This assessment, along with the

ALJ's findings throughout his sequential evaluation, led him ultimately to

conclude that Plaintiff was not under a disability and hence not eligible for DIB.

(*Id.*).

## IV.    JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines:  whether

substantial evidence in the administrative record supports the ALJ's factual

findings and whether the ALJ "applied the correct legal criteria." *Bowen v.*

*Comm'r. of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).  "Substantial evidence is

defined as 'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" *Id.* at 746 (citing in part *Richardson v. Perales*,

402 U.S. 389, 401 (1977)).  It consists of "more than a scintilla of evidence but less

than a preponderance . . ."  *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review of the administrative record and the ALJ's decision is not *de novo.  See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). The required analysis also is not driven by whether the Court agrees or disagrees with an ALJ's factual findings or by whether the administrative record contains evidence contrary to those findings.  *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld "as long as they are supported by substantial evidence."  *Rogers*, 486 F.3d at 241 (citing *Her*, 203 F.3d at 389-90).

The second line of judicial inquiry – reviewing the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *See Bowen*, 478 F.3d at 746.  This occurs, for example, when the ALJ has failed to follow the Commissioner's "own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Id.* (citing in part *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir.2004)).

## V.    DISCUSSION

### A.    <u>The Parties' Contentions</u>

Plaintiff contends that the ALJ's conclusions regarding Plaintiff's residual functional capacity ["RFC"] and her ability to return to her past relevant work are not supported by substantial evidence. (Doc. #12). Specifically, Plaintiff argues that the ALJ erred in failing to accord greater weight to the opinion of Plaintiff's treating psychiatrist, which Plaintiff avers was supported by the medical evidence and with which Plaintiff avers that "the testifying medical expert did not disagree." (*Id*. at 1, 12-16). Plaintiff further contends that the ALJ did not fully comply with applicable Social Security regulations in his evaluation of either treating psychiatrist Dr. Siddiqi's or medical expert Dr. Buban's opinions. (*Id.* at 16-19). Additionally, Plaintiff urges that the ALJ erred in concluding that Plaintiff still could function as a shipping clerk or typist despite the effect of her physical limitations on her ability to perform those jobs as described in the *Dictionary of Occupational Titles*. (*Id.* at 19-20).

Conversely, the Commissioner contends that substantial evidence supports the ALJ's decision in both respects. (Doc. #15). He urges that Dr. Siddiqi's opinion is "not borne out by the record," conflicts with other mental health evidence (*id.* at 11-14), and exceeds the scope of her psychiatric expertise. (*See id.* at 13, n.5). Additionally, he asserts that the ALJ properly relied on the vocational

expert's testimony in concluding that Plaintiff could perform her past relevant work.  (*Id.* at 15-16).

**B.**     **Medical Source Opinions**

*1.     Treating Medical Sources*

Key among the standards to which an ALJ must adhere is the principle that greater deference generally is given to the opinions of treating medical sources than to the opinions of non-treating medical sources.  *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see* 20 C.F.R. § 404.1527(d)(2).  This is so, the Regulations explain, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a DIB claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examiners, such as consultative examinations or brief hospitalizations . . ."  20 C.F.R. § 404.1527(d)(2); *see also Rogers*, 486 F.3d at 242.  In light of this, an ALJ must apply controlling weight to a treating source's opinion when it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record.  *Rogers*, 486 F.3d at 242; *see Wilson v. Comm'r of Social Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(d)(2).

If either of these attributes is missing, the treating source's opinion is not deferentially due controlling weight, *Rogers*, 486 F.3d at 242; *Wilson*, 378 F.3d at 544, but the ALJ's analysis does not end there.  Instead, the Regulations create a further mandatory task for the ALJ:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable [data] . . . or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. . .

Social Security Ruling 96-2p, 1996 WL 374188 at *4.  The Regulations require the ALJ to continue the evaluation of the treating source's opinions by considering "a host of other factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.2d at 544.

"[I]n all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician [or psychologist] is entitled to great deference, its non-controlling status notwithstanding."  *Rogers*, 486 F.3d at 242.

### 2. *Non-Treating Medical Sources*

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical

issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p, 1996 WL 374180 at *2. Yet the Regulations do not permit an ALJ to automatically accept or reject the opinions of a non-treating medical source. *See id*. at *2-*3. The Regulations explain, "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. § 404.1527(b). To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in § 404.1527(d), including, at a minium, the factors of supportability, consistency and specialization. *See* 20 C.F.R. § 404.1572(f); *see also* Ruling 96-6p at *2-*3.

C.     **Analysis**

1.     *The Mental Health Evidence*

The ALJ correctly described the legal standards applicable under the treating physician rule and also correctly described the additional regulatory factors that apply to treating physicians and other medical sources under 20 C.F.R § 404.1527(d) and (f). (*See* Tr. 471). The ALJ then applied the correct legal criteria to Dr. Siddiqi's opinion, finding that it was "neither well supported by medically acceptable clinical and laboratory diagnostic techniques nor consistent with other substantial evidence in the case record." (Tr. 474). The ALJ's

conclusion to that effect is supported by substantial evidence in the record, demonstrating that his refusal to give Dr. Siddiqi's opinion controlling weight was not error for purposes of this review.  *See* 20 C.F.R. § 404.1527(d)(2)-(5).

The ALJ's additional conclusion that Dr. Siddiqi's "pessimistic assessment of the claimant's mental capabilities" in 2004 could have been based only "on uncritical acceptance of the claimant's subjective complaints and allegations" underscores why he found Dr. Siddiqi's opinion to be less convincing than that of other psychological medical sources in the record.  (Tr.  474).  Reiterating Plaintiff's account to Dr. Flexman of her day-to-day functioning, the ALJ weighed the evidence as suggesting that Plaintiff experiences no more "than a 'mild' degree of limitation in her ability to do activities of daily living."  (Tr. 477).  He specifically noted that, according to Dr. Buban's 2007 testimony, "symptoms of the claimant's mental impairment (depressive disorder) are effectively controlled with the use of prescribed psychotropic medication," and that "[t]he claimant's condition remains relatively stable with periodic appropriate conservative care and treatment."  (Tr. 482).  As a result, ALJ Shell found that Plaintiff's subjective allegations of disability – on which he previously had deduced that Dr. Siddiqi's opinion was premised (*see* Tr. 474) – were "disproportionate and less than credible."  (Tr. 482).

The ALJ's analysis of Plaintiff's credibility thus effectively undermined Dr. Siddiqi's opinion as well. As Plaintiff's Statement of Errors raises no challenge to that credibility assessment (*see* Doc. #12), the ALJ's conclusion about Plaintiff's lack of credibility lends substantial evidentiary support for his rejection of Dr. Siddiqi's disability opinion.

Plaintiff nevertheless urges that the ALJ's analysis was mistaken, as "Dr. Buban did not actually disagree with the opinion of Dr. Siddiqi." (Doc. #12 at 13). Contrary to Plaintiff's implication, however, Dr. Buban did not concur in Dr. Siddiqi's opinion that Plaintiff's work-related abilities were "markedly" limited. Dr. Buban testified that Plaintiff could work with certain restrictions, including low-stress, simple and detailed but not complex work, work that required no more than occasional contact with the public and no teamwork, and no strict production quotas. (Tr. 780-81). While Dr. Buban did opine that her own <u>mental health</u> assessment of Plaintiff did not contradict Dr. Siddiqi's, she suggested that Dr. Siddiqi appeared to have arrived at her more restrictive assessment of Plaintiff's abilities by "considering the physical in addition to the psychological/psychiatric." (Tr. 782).

Dr. Siddiqi's apparent inclusion of Plaintiff's physical as well as mental impairments distinguishes her opinion from that of the other mental health

professionals whose opinions appear in the record, and serves as an additional justification for discounting her opinion. As Defendant aptly observes, Dr. Siddiqi's opinion regarding Plaintiff's <u>physical</u> limitations would stray beyond her area of specialization as a psychiatrist, and presumably carry less weight than the opinions of physicians whose practices focus on physical ailments. (Doc. #15 at 14, n.5). As the ALJ duly observed, in the prior review of this matter, this Court "did not take exception" to any of the ALJ's findings "relative to [Plaintiff's] physical impairments" (Tr. 472), or to his conclusion that Plaintiff was <u>not</u> disabled by her physical impairments. (*See* Tr. 11-28). In his 2007 decision following remand, the ALJ noted that Plaintiff's "overall physical condition in general and her cardiac condition in particular have remained relatively stable," and that "[n]o substantial evidence documenting significant deterioration in [her] physical condition" had been presented. (Tr. 473). Because Plaintiff also does not here challenge the ALJ's findings regarding her <u>physical</u> impairments, the ALJ could discount Dr. Siddiqi's 2004 opinion as to Plaintiff's physical symptoms without committing error.

In addition, a review of the ALJ's decision reveals that he considered the record as a whole and reasonably concluded that Plaintiff could perform a range of light work. (Tr. 484). Despite finding that Plaintiff <u>does</u> have a severe mental

impairment in the form of an affective or depressive disorder, the ALJ

nonetheless was unconvinced that such impairment "would prevent [Plaintiff]

from performing all manner of competitive work activity" as opined by Dr.

Siddiqi in 2004. (Tr. 478; *see also* Tr. 481). Therefore, "based on the findings of . . .

Dr. Flexman and . . . Dr. Buban," ALJ Shell found that Plaintiff's "capacity to

work in competitive employment is not compromised to an extent indicative of

disability." (Tr. 478). In doing so, the ALJ properly considered the medical

source opinions, the objective medical evidence, and other pertinent evidence.

*See* 20 C.F.R. § 404.1545. The ALJ's reliance on Dr. Buban's opinion was

warranted because she was the only medical source who reviewed the entire

record and also considered Plaintiff's testimony during the hearing, <u>and</u> gave the

most longitudinal view of the evidence. (Tr. 763-82). The ALJ therefore properly

gave Dr. Buban's opinion significant weight. *See* 20 C.F.R. § 404.1527(d)(3) ("We

will evaluate the degree to which these opinions consider all of the pertinent

evidence in your claim, including opinions of treating and other examining

sources.").

The ALJ also gave weight to Dr. Flexman's opinion because, in contrast to

Dr. Siddiqi, Dr. Flexman conducted a detailed inquiry into Plaintiff's regular

activity level, which included preparing food daily, cleaning her home,

babysitting her grandchildren, attending her grandchildren's activities, attending church, watching television, and socializing with her friends, siblings, children and grandchildren. (Tr. 731). In doing so, Dr. Flexman avoided relying solely on Plaintiff's isolated statements concerning what she could or could not do; he based his opinion on the types of signs described in Listing 12.00B – unlike Dr. Siddiqi, who appeared to rely only on Plaintiff's own statements. (*See* Tr. 474). *See Smith v. Comm'r. of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007) (finding no error when ALJ rejected physician's opinion based only on plaintiff's description of her symptoms where ALJ found her description to lack credibility); *cf.* 20 C.F.R. § 404.1529(a) ("statements about your pain and other symptoms will not alone establish that you are disabled . . .").

The ALJ also noted that Plaintiff's mental status has improved with counseling and the use of prescribed psychotropic medication. (Tr. 473). After careful consideration of the evidence of record, the ALJ found that Plaintiff met the burden of proving the existence of a severe mental impairment. (Tr. 478). However, according to the ALJ, Plaintiff had not presented convincing substantial evidence to establish that this impairment would prevent her from performing all manner of competitive work activity, taking into consideration those functional limitations described by Dr. Buban. (*Id.*). *See* 20 C.F.R. §

404.1529(c)(3)(iv)-(v).  Based on the record as a whole, the ALJ reasonably

concluded that Plaintiff could perform a range of light work.

2.    *The Vocational Expert's Testimony*

Plaintiff next suggests that the ALJ erred because he did not attempt to

reconcile Plaintiff's physical limitations with the demands of her prior jobs as

described in the *Dictionary of Occupational Titles*.  (*See* Doc. #12 at 19-20).  The

Court finds no merit to this assignment of error.

Applicable regulations permit ALJs to consider "'reliable job information'

available from various publications" as evidence of a claimant's ability to

perform certain types of work.  SSR 00-4p, 2000 WL 1898704, at *2 (S.S.A. Dec. 4,

2000) (citing 20 C.F.R. §§ 404.1566(d) & 416.966(d)).  Such publications include the

*Dictionary of Occupational Titles*, which provides "information about jobs

(classified by their exertional and skill requirements) that exist in the national

economy."  20 C.F.R. § 404.1569.  The same regulation authorizes ALJs to

consider the testimony of designated vocational experts as another source of

occupational evidence.  SSR 00-4p, 2000 WL 1898704, at *2; *Lindsley v. Comm'r of

Soc. Sec.*, 560 F.3d 601, 603 (6th Cir. 2009).

In an effort to ensure that any actual or apparent conflicts between a

vocational expert's testimony and information contained in the *Dictionary of*

*Occupational Titles* are addressed, the Social Security Administration imposes on ALJs an affirmative duty to ask the vocational expert if the evidence that he or she has provided "conflicts with [the] information provided in the DOT." SSR 00-4p, 2000 WL 1898704, at *4. ALJs also must "obtain a reasonable explanation for . . . apparent conflict[s]" if the vocational expert's evidence "appears to conflict with the DOT." *Id.*; *see Lindsley*, 560 F.3d at 603.

Having determined that Plaintiff was unable to perform a full range of light work, ALJ Shell appropriately called a VE to testify as to whether Plaintiff, given her limitations, was capable of performing her past relevant work. As noted above, Ms. Harris, the VE present at the August 1, 2007 hearing, confirmed the testimony of Eric Pruitt, the VE from the prior ALJ hearing, to the effect that Plaintiff's past employment as a typist and a shipping clerk involved semi-skilled jobs that required sedentary or light exertion. (Tr. 782-83; *see* Tr. 56). In response to a question from the ALJ, both Ms. Harris and Mr. Pruitt affirmed that such jobs did not "differ" from the *Dictionary of Occupational Titles*. (Tr. 783; Tr. 56). Ms. Harris then testified that Plaintiff could perform her past relevant work. (Tr. 784-85).

Noting that the ALJ specifically found that Plaintiff "should not be expected to lift overhead" with her right arm or to use that arm "for other than

gross assistive movements" (*see* Tr. 27, Finding #5), Plaintiff argues that the ALJ's

reliance on VE Harris's testimony was improper because the *Dictionary of*

*Occupational Titles* describes typist and shipping clerk jobs "as requiring reaching

and handling up to two-thirds of the workday." (Doc. #12 at 19). ALJ Shell

complied with SSR 00-4p's mandate simply by asking Ms. Harris if her testimony

differed from the *Dictionary of Occupational Titles*, and receiving her assurance

that it did not. (*See* Tr. 783); *see Lindsley*, 560 F.3d at 606 ("There is little doubt

that the ALJ satisfied his obligation under S.S.R. 00-4p by asking [the VE] about

any apparent discrepancies between the information provided by the DOT and

that which [the VE] himself presented.") . Where a VE "credibly testified" that

no such conflict existed and the claimant "was afforded a full opportunity to

cross-examine" the VE, "[t]he ALJ had no duty under S.S.R. 00-4p to interrogate

[the VE] further." *Id.* (citing *Martin v. Comm'r of Soc. Sec.*, 170 Fed. Appx. 369, 374

(6th Cir. 2006) ("Nothing in S.S.R. 00-4p places an affirmative duty on the ALJ to

conduct an independent investigation into the testimony of witnesses to

determine if they are correct.")). Because Plaintiff's counsel was permitted to

cross examine Ms. Harris after she testified that her observations were consistent

with the *Dictionary of Occupational Titles* (*see* Tr. 785-87), ALJ Shell did not err by

relying on Ms. Harris's representation to that effect.

Plaintiff's argument on this point also fails for two additional reasons. First, Plaintiff has cited no authority for her position that Ms. Harris was mistaken in testifying that no conflict existed between her testimony and the *Dictionary of Occupational Titles*.  Nothing about "reaching and handling up to two-thirds of the workday" seems inherently incompatible with a limitation on the use of one's right upper extremity to only "gross assistive movements" and no overhead lifting.  (*See* Tr. 27, Finding #5).  To the contrary, most tasks normally associated with a typist or clerk position would seem to lend themselves to completion within those constraints.

Second, even when testimony of a vocational expert does conflict with the *Dictionary of Occupational Titles* as to a claimant's ability to perform certain work, the *Dictionary of Occupational Titles* does not automatically "trump" the VE's testimony, because that publication is not the sole source of admissible information concerning jobs.  *See* 20 C.F.R. §§ 405.1512, 405.1520; *see also* SSR 00-4p, 2000 WL 1898704, at *2.  Social security regulations do not require the Commissioner or the VE to rely on classifications in the *Dictionary of Occupational Titles*.  Accordingly, an ALJ may rely on the vocational expert's testimony even if it is inconsistent with the *Dictionary of Occupational Titles*.  *Conn v. Sec'y of Health*

*& Human Servs.*, 51 F.3d 607, 610 (6ᵗʰ Cir. 1995).  As such, ALJ Shell's reliance here

on Ms. Harris's testimony does not warrant remand.

Although Plaintiff's Statement of Errors suggests that the evidence here

should have been weighed differently, her assertions do not undermine the

substantial evidence supporting the ALJ's assessment of the medical source

opinions and his other findings.  Consequently, the ALJ's decision must be

affirmed.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6ᵗʰ Cir. 2003); *see also*

*Mullen v. Bowen*, 800 F.3d 535, 545 (6ᵗʰ Cir. 1986).

IT THEREFORE IS **RECOMMENDED** THAT:

1.     The Commissioner's non-disability determination be
       **AFFIRMED**; and

2.     The case be terminated on the docket of this Court.

October 28, 2009                                    ____s/ Sharon L. Ovington_____
                                                    Sharon L. Ovington
                                                    United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten [10] days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen [13] days (excluding intervening Saturdays, Sundays and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten [10] days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Am*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981).